I'd like to reserve three minutes for rebuttal. ECMC in this case has appealed a partial discharge of student loan debt in bankruptcy. We contest no findings of fact, and thus, the only issue before us is whether the bankruptcy judge's legal conclusions were correct as a matter of fact. Speak up just a little bit. I'm having a little difficulty hearing it. Yes, Your Honor. There you go. Thank you. The only issue before us this morning is whether the bankruptcy judge's legal conclusions were correct. We contend they were not. The Guaranteed Student Loan Program is one of the most important social programs we have. Without regard to age, gender, disability, or course of study, Congress makes, Congress guarantees that all has access to higher education. And in exchange, Congress restricts bankruptcy relief to those most dire. At trial, Keith Mason is a 33-year-old former gold glove boxing champ. He is well educated. He is not married. He has no children. He had been diagnosed with a learning disability in the third grade, and he testified that he has some trouble reading. Nevertheless, he went on to get a bachelor's degree in philosophy with a grade point average of higher than 3.0. He was accepted to Gonzaga Law School, where he graduated in three years, in 1999. One year later, he took the bar, and he did not pass. He filed bankruptcy in January 2003, and this adversary proceeding commenced shortly thereafter. In the month before trial, Keith Mason worked about 15 hours a week hanging siding for a friend of his at the rate of $10 an hour. Kennedy, you only have 10 minutes, and we're pretty familiar with the facts. What are the conclusions that you differ with, and for what reasons? There are two issues that I'd like to focus on this morning. Number one, what is an additional circumstance under the three-pronged Bruner test that this Court has adopted in Pena? And number two, the requirement to make a good faith effort to maximize income. Most courts in most jurisdictions discuss this under the third prong, good faith. In some case law, the Ninth Circuit BAP has discussed this in the Nascimento case under the first prong, but I think it's normally discussed under the third prong. Would you say, as a matter of law, there's the program that people can access that I think it's for 25 years, and they adjust the amount that you pay, and then at the end of 25 years, whatever you haven't paid. Yes. Would you suggest that if someone, and he apparently said he hadn't applied for that, correct? That's correct. So do you basically say, as a matter of law, that someone's at least got to try that before they, to satisfy good faith? Yes, Your Honor. Most courts have indicated that a good faith effort to repay the loan includes considering the Income Contingent Repayment Program, which is the program run by the Department of Education that allows debtors to pay a portion of their income, depending on the poverty guidelines and their family size and their income level. They must at least consider this. They don't have to apply for it because this is not a silver bullet for all debtors. It does not work for everybody. But in this case, I believe the testimony was for Mr. Mason. At his income level, his payment would be approximately $165 a month. Now, the important thing here is he worked about 15 hours a week in the month prior to the trial, and sometimes he would work more than that. It was seasonal work, hanging sighting for a friend of his. So some of the ---- He has made some efforts to obtain full-time work, right? The evidence at trial indicated that his job search was mostly focused on sending 84 applications into the Transportation Security Agency for various positions there. He had testified that he had made some other efforts to find work. He had put in a couple of applications to be an investigator. I think he had even applied for one paralegal position. But the expert testimony at trial indicated that his job search really focused on one or two applications a month, which was wholly inadequate, according to the vocational counselor who testified as an expert witness. She said that an average or responsible job search would be more like four or five applications a day sometimes. And in this case, he had done a couple of applications a month. There really wasn't any indication that he wanted to find additional work. And furthermore, there wasn't any indication that he wanted to use the J.D. degree that he had earned with these student loans. He failed the bar once after waiting a year to take it, and he testified that he had no intention of taking it again, despite the fact that he had lengthy periods of unemployment and he had sporadic, seasonal, part-time work. Now, are all those factors to be considered under the good-faith test? Yes, Your Honor. As I indicated earlier, sometimes courts will indicate the debtor's lack of efforts to maximize income under the first prong, but I think most courts appropriately decide this under the third prong. He has to make a good-faith effort to minimize expenses, which we don't disagree with, but he also has to make a good-faith effort to maximize his income. Now, did the district court make a finding on that? The court made a finding. Whether he met the good-faith test? The court did say as a legal conclusion that he met the good-faith test. The court also found as underlying findings of fact that he had not made any effort to take the bar.  The judge also made findings of fact that he hadn't really done a solid job search inside or outside the district. All right. So, obviously, in terms of to get to where you're asking this court to go, how do we view findings of fact and standards of review? How do we get there? Well, the findings of fact are uncontested. And so the only issue in front of this court is a de novo review of the conclusions of law the bankruptcy court derived from those findings of fact. And in this case, I think it's appropriate to look at the legal conclusion of whether he made a good-faith effort to maximize his income, which we respectfully contend he did not. And thus, he does not satisfy the third prong of the Bruner-slash-Pena test. We also need to look, and I think this is an equally important focus in this case. So, I mean, it would stand for the future proposition, essentially, if you don't consider this program as a matter of law, you would not have shown good faith? That's one component of it, I think. I don't think that is determinative, but I think it is very highly probative. And most courts around the country do consider that to be a highly probative part of the third prong. Additionally, he needs to maximize his income. He needs to minimize his expenses. He needs to have otherwise made a good-faith effort to repay his debts. But the other issue is the additional circumstances. And this Court, since adopting Pena in 1998, which adopted the Bruner test, on through Rufino, Saxman, and even a couple months ago in the Nye's case, this Court has said that the additional circumstances must show insurmountable barriers. And in the Nye's case, the Court listed probably a dozen factors or so that were not dispositive of the insurmountable barriers, but certainly probative of the barriers that a debtor could face to satisfy the second prong. And he has none of those 12. He has no advanced age. He has no physical impairment. That's like two and a half minutes. I don't know if you want to reserve the balance, or just finish up this thought. I'll just finish up this point real quickly. And I think the other important part is that the preexisting conditions cannot be or the conditions that the debtor asserts to satisfy the second prong cannot be preexisting conditions. Courts have indicated that a pre-loan condition cannot be the basis for the additional circumstances. The Seventh Circuit specifically states this in Goulet. The Fifth Circuit specifically states this in Gerhardt. And I think it's a logical position to take. Thank you. Roberts. Does that mean that we should not consider his difficulty in learning, his learning disability? I think that's correct, because if you look at the underlying logic, he has had this learning disability since third grade. He has gone through all of, obviously, primary school and high school with this learning disability. And he made the conscious choice to go out and take these student loans out to go to college and to law school. And now he's coming back and asking for a discharge. So you said at the beginning of your argument that, well, a student loan program is one of the most significant social programs we have, and one reason is because it offers loans to everybody, including the handicapped. That's right. If that's the purpose of a student loan, I mean, you know, well, why should you penalize a handicapped person for applying for a student loan? Well, this isn't penalizing a handicapped person for applying for a student loan. What this is doing is putting the decision, it's putting the result of that decision on the student. If the student has a condition that he knows about and he takes out a significant amount of student loan, like Mr. Mason did here, he should not then be allowed to turn around immediately after getting the benefit of those student loans and asserting this preexisting condition. No other court has made that decision. No other court has said that the preexisting condition can be the basis for discharging that same student loan. Mr. Fisher, it seems to me that if you look at this case, and if it's a person who has no disabilities at all and had done what this person had done and made the determination, you know, that's one thing. It doesn't look like maybe he did maximize the ability to earn income. But if you look at him as a learning disabled person, if that's the correct phraseology, then you may say, well, you know, these things were reasonable for a person in that circumstance, and yet you're telling us we can't consider that circumstance, we have to consider him as if he had no disability at all? I'm not necessarily saying that you had to consider him as no disability. What I am saying is that it's counterintuitive to allow a debtor to come in and rely on the same condition that he has had prior to taking out the loans and then turning around immediately after the loans were the loans come due and saying because of this condition, I can no longer repay the loans. I think that's counterintuitive, and that's specifically why Congress has restricted the bankruptcy discharge to those in the most dire circumstances. And the other thing here, and I think this is very important but not discussed much by the bankruptcy judge, is the Nye's case says that there is no presumption for the debtor that the financial circumstances will persist. And the court in Nye's goes on to say that the debtor bears the burden to show that these additional circumstances will cause a continuing inability to pay. And in this case, there was no discussion by the debtor. There was no evidence by the debtor that he had even been diagnosed with this other than his testimony that says, I have had problems reading. I went to get tested in third grade. Subsequent to that, I've had some problems reading. But there's no evidence from the debtor to show the severity of his condition. There's no evidence to show that this will continue to impact any type of vocational career. And most importantly, the only evidence in the case directly contradicts that, because he went on to get a bachelor's degree in philosophy with a 3.02 GPA, which is very reading intensive, I would respectfully suggest. And then he went on to get a law school degree at Gonzaga University. So the only evidence in the case, which is our expert testimony along with the debtor's own academic successes, indicate that this is not an insurmountable barrier under the guise of a doubt. Your time has expired. Thank you very much. Thank you. May it please the Court, my name is Joseph Meyer. I represent Keith Mason, the appellee in this proceeding. And I want to use my ten minutes to talk about the Bruner test. Obviously, that's the most important thing here. And while the briefing raises several issues, I would suggest we're not talking about prong one. That seems to be conceded by ECMC in this case. So we're really focusing on prongs two and three. And I want to take them out of order. To the good faith, there were some questions here about you don't dispute the facts that the court found and then reach the legal conclusion that the debtor had acted in good faith. But there are several things that counsel and I differ on the interpretation of the evidence. For example, at the end of his discussion, he talked about how successful Mr. Mason has. But if you look at the evidence that's in the record, you will see that it hasn't been an easy road for Mr. Mason. He did graduate from law school, but let's review how he got there. He kind of talked himself back in or something. Correct. In fact, the school at the end of the first semester or at the end of the first year told him he was out, and he talked himself out. He was very persuasive. The school accommodated him by letting him take extra time on exams. The school accommodated him by asking him to get a proctor. Moving backwards a bit, his LSAT scores were very low. It was very hard for him to get into the school. In fact, if the court will review the record, it will see that in getting into law school, he actually went to the summer school. Given all that, obvious to me that his intelligence and his achievement and his education is well above the average in the population. There's no question in my mind about that. The question is what he's done with that. But even more basically, you know, there's not much in the record what his learning disability is, what that means, and how that handicaps him today. He's not going to school anymore. There's not much in the record. What is a learning handicap as far as the record shows? What I understand from the record is that he has- Some reference to dyslexia. Dyslexia. He mixes up letters and words. Right and left. In fact, the expert recognizes that. The expert recognizes that he has the disability. The expert says in order for him to succeed, employers are going to have to give him some accommodations. He isn't able to concentrate. It takes him longer to read documents. That is the problem that he had. And I suggest you see it- Which on the bottom line doesn't mean he's not employable, right? On the bottom line, it doesn't mean he's not employable. The question is whether he's- Maybe he's capable of holding a full-time job. Well, the question is will the employer accommodate him? And the further question is, is it right in this case to be looking at a person who wasn't able to pass the bar, who went through all this, the educational establishment- Well, you know, a lot of people don't pass the bar the first time. In California, it's over 50% of all people who take it. But he never tried a second time. He didn't try a second time in the state of Idaho. And the statistics that are in the record shows that the second-time test takers are down around 30%, as opposed to I think the statistics that the expert gave was 75% to 80% passed the first time. So I don't- While my state may question this, I don't know if we can compare California to Idaho. I think it's a different-maybe a different bar. But that statistic is in the record. I would suggest, unlike the usual law student that comes out, Mr. Mason is facing a bigger challenge of passing the bar. But I don't know if you- I think the things that probably would concern anyone looking at it is that he didn't try more than once to pass the bar, that he didn't avail himself, at least try something on the program where it allows you to pay a lesser amount and at 25 years. And he's not working full-time. And, you know, in terms of it's Friday, and I've been here all week, and I'm, like, really tired. And, you know, I'd like to work 15 hours a week too. But it's-or, you know, or sometimes if you're-his disability in terms of, yeah, he probably would have difficulty with the disability working at a job where you have to read a lot. But there are a lot of jobs where you don't have to read a lot, where he was, what, making somewhere $1,200 a month. $1,200 a month, I think. Right. And he wasn't-you know, he doesn't have all this credit card debt. He's not going-you know, he's not living extravagantly. He's fine on all of those things. But there isn't any reason that he can't work more hours, that he can't work a second job. And so those things, I think, would trouble anyone looking at it when they think, why should you get this discharge right now? Why shouldn't you just try it for 25 years, pay what you can? Your Honor, in my response to that, I think if you look at the record, there's a couple things that we need to highlight on that. First of all, it wasn't like he was not trying to find a job. I think the testimony was quite clear. In fact, pages 113 through 115 of the record, he testifies that he was on a first-name basis with a job service person at the Department of Employment. He was applying. His testimony was he had submitted over 100 applications. He had applied for over two paralegal positions, never got an interview. Most of those 100 were to the same employer, right? The expert testified that it was to the TSA, the Transportation Security, but that's not what Mr. Mason testified to. He testified that he had submitted over 100 applications and he continued to request information from the job service. He testified also that he was trying to get a second job. He just hadn't been successful at the time of trial. And secondly, when he got out of law school, he worked for Micron, and the reason he lost that job is he was laid off. So this is not a gentleman that just got out of law school, flunked the bar, and then threw up his hands. He was trying to obtain employment. I concede that at the time of trial, he hadn't obtained full-time employment, but he was quite clear and emphatic. In fact, you'll see it in the judge's decision.  He has a lot of ambition. We obviously convinced two different judges, too, that he was entitled to this, and that, I guess, troubles me in your favor in the sense that I'm not seeing him the way those individuals would be seeing him. Well, and again, I just have to suggest to you we have to look at the record. He's not like this typical student that gets through school. If you look at the record, it was a huge challenge for him to get through elementary school. He flunked out of high school and went to an alternative school, and then he got his degree. And the record will show that tortured path of how he got to where he was eventually graduating from a law school with a law degree. He then comes out, and he gets a job. I want to address the income contingency plan before I forget it, too. I think the evidence is pretty clear. Mr. Mason did try, and his parents tried, to obtain different programs with those or to get into those types of programs. And so I don't think, as far as looking at the good faith, that ECMC is right. I think there was that kind of effort. I don't think it's disputed. He cut back his expenses at the time of trial. He didn't have health insurance. He's driving an old car. He was living, I would suggest, with his expenses below poverty. Second, he wasn't living any kind of an extravagant lifestyle. He had cut back. And third, I think the evidence in the record shows that this was a man who attempted to work out something for four or five years after law school to work out a payment plan, and it wasn't forthcoming. He testified and his mother testified at trial that those applications had been made. So when you look at the big picture of, you know, can this man afford to pay the ECMC $100,000 obligation, I think what's important is the bankruptcy judge concluded that, no, he couldn't under the Brunner test. Because of this additional circumstance, which isn't extraordinary, as ECMC has argued and this Court has said in the Nye's case, we're not looking for something that's extraordinary. We're looking for additional circumstances that differs Keith Mason from the garden variety debtor that has student loans. And I would suggest this disability is exactly what we have here. Nye's provided a laundry list of different things, but it wasn't exclusive. All it was saying is, show us some reason why he's different from somebody else. Show us some reason why, looking at the future for this man today, will he be able to pay $100,000 of obligations. What the court concluded, what the bankruptcy court concluded was, through the Saxman analysis that this court brought down, that I can use my discretion. ECMC has not questioned an abuse of discretion by the judge saying, I find that he can't pay $100,000, but I find he can pay $34,200. I think I'm close on that, plus interest. If given a two-year plan, then he's going to pay that. So we don't, at this level, we don't question that at all. We agree with the partial discharge, and we think the bankruptcy court came down under the Saxman analysis, using the Brunner, applied it correctly, and it was an abuse of discretion to arrive at where the court arrived. I'm out of time. Thank you very much. Thank you both for your argument. This matter will now stand submitted.
judges: Thompson, Tashima, Callahan